THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TONY LEE, Defendant-Appellant.

(No. 58949;

First District (2nd Division)—April 8, 1975.

Paul Bradley and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Francis Baumgart, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Defendant-appellant, Tony Lee (hereinafter defendant), was arrested on 20 May 1972. His preliminary hearing was set for 15 June 1972. On that date, the public defender was appointed to represent him at that hearing, and the hearing was continued to 6 July 1972 on motion of the State. On 6 July 1972 the preliminary hearing was held and, on a finding of probable cause, defendant was bound over to the grand jury. There is no disagreement between the parties that defendant's fourth-term rights are to be computed from 6 July 1972. On 30 October 1972 (the 116th day of the 120-day period involved), defendant was indicted for the armed robbery, aggravated battery, and unlawful restraint of one Willie Ford on 10 May 1972. On the following day (31 October 1972), defendant was arraigned; the public defender was appointed to represent him as trial counsel; defendant pleaded not guilty to all three charges; the cause was assigned for trial; and the State was granted a trial continuance to 2 November 1972.

On 2 November 1972 (the 119th day of the 120-day period involved), defendant, although advised by his appointed counsel that the latter was not as well prepared for trial as he would have wished to be, insisted on going to trial that day and waived a jury. The bench trial began that day.

At the trial, Willie Ford testified for the People that, at about 7:30 P.M. of 10 May 1972, he left his house to go to a choir practice. At the intersection of 39th Street and Cottage Grove Avenue, he stopped his car for a red light. A male person (later identified as Bernick McReynolds, a juvenile) was standing at the corner and came over to the car and asked directions. The witness could not understand McReynolds so the witness drove across the intersection on the green light and then curbed his car, whereupon McReynolds followed and approached on the driver's side of the car. When the witness opened the car window a few inches, McReynolds pulled out a black automatic pistol and put the nose of the pistol in the window. He told the witness to open the door and move over to the passenger seat or else he would kill him. When the witness complied, McReynolds then got into the driver's seat and drove the car to the corner of 42nd Street and Cottage Grove Avenue. At that corner another man got into the passenger front seat so that the witness was then sitting between the two men. The witness identified the second man as the defendant.

When defendant got into the car, he pulled out a knife with a long curved blade and put the knife to the witness' side. McReynolds then drove the car to a bar called The New Mix in the vicinity of 51st Street and Prairie Avenue. There McReynolds double-parked the car, gave his

gun to defendant, and went into the bar apparently in search of some girls in order to make the group look less suspicious. Defendant held the gun on the witness. McReynolds returned alone and proceeded to drive the car to the Oakwood Avenue section of the lakefront (approximately 3900 south). There the two men took the witness out of the car. Defendant beat the witness with the gun and hit him in the face. McReynolds cut the witness with the knife and also hit him in the face with his fist. The witness surrendered to defendant the four dollars which he had on his person. Defendant then took the witness' wallet and went through it. In the wallet the witness had a traffic ticket which he was driving on in lieu of his driver's license; defendant took the traffic ticket.

The two assailants then ordered the witness to get into the back seat of the car on the floor. Defendant also got into the back seat and held the gun on the witness. The two then decided to put the witness into the trunk of the car. McReynolds opened the trunk, and defendant ordered the witness into the trunk. The men then drove off in the car. The witness attempted to pry open the lock of the trunk with a tire iron which was in the trunk.

After a short time, the car stopped. The two men greeted a third individual and asked him to accompany them, which he did. Defendant and McReynolds then had a discussion about the traffic ticket and, when McReynolds was unable to produce the ticket, defendant and the third individual left the car. McReynolds then drove the car to an alley between Cottage Grove Avenue and Drexel Boulevard on 42nd Street, where he got out of the car. The witness then succeeded in prying open the lock of the trunk, and he got out of the trunk and ran away from the car. The witness stopped a policeman, who drove him to the place where the car had been parked, but the car was gone. The policeman summoned a second police car which took the witness to Michael Reese Hospital, where he was treated and released after about an hour.

Two plainclothes police investigators then took a statement from the witness, and drove him around the area involved to see if he could locate his car. While they were driving, the witness saw his car being driven by McReynolds. The police gave chase. In his flight, McReynolds struck a parked car. The collision halted the witness' car and threw McReynolds out of it, and left him lying on the ground, where he was apprehended and identified by the witness.

At the time of this collision between the witness' car and the parked car, a Volkswagen had been sandwiched in between the witness' car and the pursuing police car. The driver of the Volkswagen started to run from the scene on foot but was apprehended by the police officers.

On 20 May 1972 the police officers again drove the witness around the

area to see if the witness could locate the second assailant. As they drove around the area, the witness saw and pointed out defendant as the second assailant, and the police immediately arrested defendant.

On cross-examination, it developed that the person who had been driving the Volkswagen was one Carl Avery. The witness thought he had been charged with carrying a gun. The witness had not seen Avery during the occurrence of the robbery and beating. The first time the witness saw defendant after the incident was on 20 May 1972, when defendant was pointed out and arrested.

On the night of the robbery, the witness had given a description of each of the two men who had robbed him. One was a male Negro, 5'9" tall, wearing a black jacket and red corduroy pants; he was approximately 20 years old and had a medium brown complexion. The other individual was also about 5'8" or 9" tall and was wearing a green jacket and blue pants; he was also approximately 20 years old.

The witness denied ever having gone to defendant's house or ever having told defendant not to go to Juvenile Court to testify on behalf of McReynolds. In fact, the witness denied knowing where defendant lived.

The witness stated that the knife used in the incident was found with McReynolds; McReynolds was the assailant wearing the green jacket and blue pants. A gun had been found in Avery's car which looked like the one used in the robbery.

On redirect examination the witness testified that he could see defendant clearly when defendant got into the car. The witness was sitting shoulder to shoulder between the two assailants. His view was unobstructed and the interior car light was operational. The witness never saw the face of the third individual and never had any contact with him during the incident.

Donald Hilbring, a criminal investigating officer for the Chicago Police Department, testified for the People that he and his partner proceeded to Michael Reese Hospital at about 11:40 P.M. on 10 May 1972 and located the victim Willie Ford in the emergency room of the hospital. After tests and treatment had been administered to Ford at the hospital and Ford had been released, the police officers took Ford to 39th Street and Cottage Grove Avenue in order to recreate the events which had happened to Ford earlier that night. A car identified by Ford as his passed their car and the police began to chase it. At about 41st Street and Justine Avenue, the fleeing car hit a parked car. The police officers were also chasing a Volkswagen because the Volkswagen was following the Ford car very closely. After the accident the driver of the Ford car and the driver of the Volkswagen were arrested. A hooked knife was

found in the Ford car. An automatic pistol was found in the Volkswagen. The traffic ticket described by Ford was recovered from McReynolds' wallet.

Ten days later, the witness and his partner again drove Ford around the area involved. At 4018 Cottage Grove Avenue, Ford picked out an individual who was standing in the doorway of that building as being the second assailant. The officers immediately placed the individual under arrest. The witness identified the individual as defendant. The officers took defendant to a police station, placed him in a room, and advised him of his rights.

When questioned about the robbery, defendant had stated that the only thing he knew was that, on the date on which the alleged robbery had occurred, McReynolds had brought Ford over to defendant's house in a car, and they had had a conversation with defendant. Defendant stated that he had not bothered to get into the car and had walked away. Defendant had denied participation in the robbery.

On cross-examination, Officer Hilbring stated that Ford had identified Avery by his voice as the third individual later involved in the incident, but that Ford did not make a positive identification. Defense counsel thereupon attempted to establish that Avery was the real "second" individual who, with McReynolds, had assaulted and robbed Ford. Counsel attempted to support this theory by pointing out that a police report made after the capture of McReynolds and Avery on 10 May 1972 had designated Avery as offender two. Counsel then pointed out discrepancies between the description of the "second" offender, as given by the victim and recorded by the investigating officer in the latter's report, and the description of defendant given by the investigating officer in his arrest report of defendant. The witness then attempted to describe defendant as he presently observed him in court. This description did not agree with either of the other descriptions. The witness described Avery as being a 23- or 24-year-old male Negro of medium build with a medium brown complexion and a dark mustache, and 5'10" or 11" tall.

On redirect examination Officer Hilbring stated that only two of the three men involved in Ford's incident were participants throughout the incident; the third man did not become involved until after Ford had been placed in the trunk of the car. The witness then stated that Carl Avery was the third man whom Ford could not identify other than by his voice because Ford had never had the opportunity to see the third man. The witness also stated that McReynolds was shorter and younger than the defendant.

After the conclusion of Hilbring's testimony, the court admitted into

evidence the black automatic pistol found in Avery's car, the hooked knife found in Ford's car at the time McReynolds had collided with the parked car, and Ford's traffic ticket found in McReynolds' wallet. The court did so over the objection of defense counsel that no connection had been established between any of the three items and defendant. The State then rested its case in chief.

Defendant testified in his own behalf that, at about 6 P.M. on 10 May 1972, Willie Ford drove his car up in front of defendant's house where defendant and McReynolds were standing; defendant and McReynolds lived in the same building. Ford got out of his car and came over to where defendant and McReynolds were standing, whispered something into McReynolds' ear, and gave McReynolds the keys to the car. Defendant saw no weapons at that time. McReynolds drove off in Ford's car. Ford and defendant stood and talked in front of the building; after a short conversation about sodomy, Ford left defendant and walked away in the direction of 43rd Street. Defendant stated that he had seen McReynolds drive Ford's car on three or four prior occasions, and that McReynolds and Ford knew each other. After Ford left, defendant went into his house and remained there throughout the night.

Defendant next saw Willie Ford at Juvenile Court on either 11 May or 12 May 1972. Defendant had gone to court to be a witness for McReynolds. Defendant was not then in custody nor had he been arrested at that time. Thereafter but before 20 May 1972, Ford had come to defendant's residence and had threatened to make things tough for him if he persisted in testifying in behalf of McReynolds.

Defendant said that, when he had been arrested, he had denied knowledge of the robbery and beating. He again denied ever having seen the gun or the knife. He said that at the time of the incident he had been heavier than he was at the date of the trial and had had a small goatee.

Cross-examination added nothing of significance to defendant's testimony.

Defendant's mother, Earnneast Lee, who had been in the courtroom during the trial, corroborated her son's testimony as to his whereabouts during the evening hours of 10 May 1972.

After closing arguments, the trial judge found defendant guilty of the offense of armed robbery and sentenced him to the penitentiary for 6 to 12 years. The trial judge commented that he believed the testimony of the victim Ford and that he did not believe the testimony of either defendant or defendant's mother.

Defendant's first contention on appeal is that the identification testimony for the State was insufficient to prove beyond a reasonable doubt

that defendant was the second person who, together with McReynolds, had committed the armed robbery of Willie Ford. Defendant supports this contention as follows:

(1) Ford originally identified another man (namely, Carl Avery) as the second perpetrator of the offense;

(2) Ford's description of the second perpetrator, as reported to have been given to the police on the night of the incident, did not fit defendant; and

(3) Ford had a motive to lie in order to implicate defendant (namely, Ford had threatened to harm defendant, should defendant continue to testify for McReynolds in the Juvenile Court proceeding).

In response, the State contends that Ford, both initially and at all times thereafter, correctly identified only the defendant as the second man involved in the commission of the armed robbery against him. The State contends that any inconsistencies with respect to the description of defendant appeared solely in the testimony and reports of Officer Hilbring, and that such inconsistency was explicable.

■■ We think that the record shows that the identification of defendant by Willie Ford as the second man, who, together with McReynolds, committed the armed robbery of Ford was both positive and consistent. Such testimony, if believed, is sufficient to prove the identity of defendant beyond a reasonable doubt. (*People v. Stringer* (1972), 52 Ill.2d 564, 289 N.E.2d 631; *People v. Catlett* (1971), 48 Ill.2d 56, 268 N.E.2d 378; *People v. Taylor* (1974), 18 Ill.App.3d 367, 309 N.E.2d 642.) The alibi defense testified to by defendant and corroborated by defendant's mother creates an issue of credibility to be resolved by the trier of fact. On review, we may not disturb that resolution unless the evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt. (*People v. Catlett* (1971), 48 Ill.2d 56, 64, 268 N.E.2d 378; and see *People v. Jelks* (1968), 92 Ill.App.2d 374, 235 N.E.2d 339; *People v. Arndt* (1972), 50 Ill.2d 390, 280 N.E.2d 230.) Our review of the record in this case (and we note in our review the express comment by the trial judge, in this bench trial, of his belief in the testimony of the victim and of his disbelief in the testimony of defendant and defendant's mother) leaves us with no reasonable doubt as to the sufficiency of the identification testimony and we cannot disturb the trial court's finding.

The second contention of defendant on appeal is that he was denied due process of law in that the State, by its unexplained delay in indicting and arraigning defendant until the 116th and 117th day of the 120-day period which constitutes the Illinois statutory implementation of his

right to a speedy trial, forced defendant to make the following preju-
dicial choice: (1) either insist upon his right to a speedy trial as statu-
torily implemented, at the sacrifice of his constitutonal right to effective
assistance of trial counsel; or (2) receive effective assistance of trial coun-
sel, at the sacrifice of his right to a speedy trial as statutorily imple-
mented. It is conceded that such a "Hobson's choice", if prejudicial, is
fundamentally unfair to defendant and a violation of his right to due
process of law.

In cases involving the fourth-term right of a defendant, our supreme
court has directed that the particular facts of each case are to be ex-
amined, and that the ruling shall be such as to prevent either of the
following results: (1) the State's technical evasion of defendant's right
to a speedy trial, or (2) defendant's technical discharge despite a delay
in fact caused by defendant. *People v. Nunnery* (1973), 54 Ill.2d 372,
297 N.E.2d 129.

In our judgment, the supreme court case closest to the facts of the
instant case is *People v. Williams* (1974), 59 Ill.2d 402, 320 N.E.2d 849.
When trial counsel is appointed for a defendant, the defendant's arraign-
ment is the critical date, since the appointment of trial counsel is initially
made at that time. In both *Williams* and the instant case, arraignment
and the initial appointment of trial counsel for defendant occurred al-
most at the end of the 120-day period involved (in *Williams* on the
119th day and in the instant case on the 117th day). In neither case was
there any explanation offered by the State for such an extreme delay,
and the State, of course, is in sole control of the prosecutorial process
up to that point.

In both *Williams* and the instant case, the defendant personally in-
sisted on being tried within the 120-day period and was in fact so tried,
despite the expressed discomfiture of his appointed trial counsel at the
inadequate time afforded him for the preparation of the defense. In
*Williams*, counsel actually moved for a continuance on that ground even
in the face of his client's personal demand for trial within the 120-day
period; there was, however, no ruling on the motion for a continuance
and counsel ultimately withdrew the motion since he felt adequately
prepared for each stage of the trial as that stage was reached (*e.g.*, jury
selection; pretrial motions; presentation of evidence). In the instant case
no motion for a continuance was made and counsel merely informed
both the court and his client that his preparation was not what he would
have wished it to be, in view of the very short time afforded him.

In *Williams*, our supreme court disapproved of such extreme unex-
plained delay in indicting and arraigning the defendant, and declared

that not only would it pay the closest attention to any specific allegations that defendant had been actually prejudiced thereby, but it would itself search the record for any indication of actual prejudice. The court then noted that no such specific allegations of actual prejudice had been made and that its own search of the record had revealed no actual prejudice. Accordingly, the court affirmed the conviction of the defendant (as had the majority of the appellate court).

■■ In the instant case, we note the absence of any specific allegations of actual prejudice, and our own careful scrutiny of the record has revealed none. Hence, we reject this contention of defendant on appeal.[1]

In passing, in this connection, we note *People v. Carr* (1972), 9 Ill.App.3d 382, 292 N.E.2d 492, in which defendant was represented by appointed trial counsel who moved for a continuance on the ground that he had not had sufficient time in which to prepare for trial and was not in fact prepared. Although the State concurred in the motion, defendant personally objected thereto and demanded immediate trial. The trial court allowed the motion and, as a result, defendant was not in fact tried within the 120-day period. On appeal, this court affirmed and pointed out that, had the motion been denied. an issue might then arise as to whether defendant had been denied the effective assistance of trial counsel. It has been suggested that, in view of our decision in *Carr*, the *denial* of a motion for a continuance by appointed trial counsel for defendant on the ground of inadequate time for preparation, which denial is based upon defendant's personal demand for immediate trial nevertheless, must *necessarily* deprive defendant of the effective assistance of trial counsel to defendant's prejudice. We reject this suggestion on the authority of *People v. Williams, supra*.

Defendant's third contention on this appeal is that the introduction into evidence of the gun, the knife, and the traffic ticket constituted prejudicial and reversible error because all three items were found in the possession of persons other than defendant and were not connected to defendant.

As to the traffic ticket, the victim testified that it was defendant who took his wallet and went through it and took the traffic ticket. As to the

---

[1] *People v. Johnson* (1970), 45 Ill.2d 38, 257 N.E.2d 3, is distinguishable from both *Williams* and the instant case in that record failed to show that defendant had personally objected to a motion by his appointed trial counsel for a continuance (chargeable to defendant) to a date still within the 120-day period, which motion was allowed; nor did the record show any objection by defendant to appointment of trial counsel when, on approximately the 100th day of custody, defendant's retained counsel received leave to withdraw; and there was no unexplained extreme delay by the State in indicting and arraigning defendant.

knife, the victim testified that it was defendant who, after he entered the car, pulled out a knife with a long curved blade and held it to the victim's side, and that this knife was subsequently used by McReynolds to cut the victim. Officer Hilbring testified that a hooked knife was found in the victim's car after McReynolds had collided with the parked car. It was this knife which was admitted into evidence. As to the gun, the victim testified that McReynolds had pulled out a black automatic pistol, and that defendant had later held this gun on the victim and had beaten the victim with the gun. Officer Hilbring testified that an automatic pistol had been found in Carl Avery's Volkswagen, and it was this gun which was admitted into evidence.

Hence, as to the traffic ticket, the victim's testimony directly connected it to defendant before it was ultimately found in McReynolds' wallet. As to the gun and the knife, the State correctly points out that they were not admitted into evidence as the same gun and the same knife which had been used in the armed robbery. In *People v. McCasle* (1966), 35 Ill.2d 552, 559, 221 N.E.2d 227, 231, our supreme court said:

> "There was sufficient testimony to establish that at least one weapon was used in the commission of the offense, there was substantial evidence that defendant participated in the crime, and there was testimony that the weapon admitted was similar to the one used during the robbery. Under these circumstances, reception of the weapon as evidence against defendant was proper, for, as we said in *People v. Ashley*, 18 Ill.2d 272, 280, *cert. denied*, 363 U.S. 815, 80 S.Ct. 1255, 4 L.Ed.2d 1157, '* * * a weapon may be admitted in evidence where there is proof to connect it with defendant and the crime. However, it is not necessary to establish that the particular weapon was the one which was actually used. * * *'"

On that authority, we hold that it was not error to admit the gun and knife into evidence.

Defendant's fourth contention on this appeal is that it was reversible error to permit Officer Hilbring, who was not present during the commission of the armed robbery, to testify as to who was involved in it. The reference is to the Officer's testimony on redirect examination that the third man who entered the car, while the victim was in the trunk of the car, was Carl Avery. But this testimony must be considered in the context of the cross-examination of the Officer. Defense counsel attempted to show that the "second" man involved in the offense was not defendant but Carl Avery. Counsel established that, in a police report of the arrest of McReynolds and Avery on 10 May 1972, Avery had been

designated as offender two. He then called attention to the fact that descriptions of the "second" offender in the police investigative report for the night of the incident and in the police arrest report on defendant's arrest 10 days later not only contained discrepancies but neither description fitted defendant; and Officer Hilbring's attempt during cross-examination to describe defendant in court merely contributed a third faulty description.

It must be remembered, however, that on cross-examination Officer Hilbring had also testified that the victim had identified Carl Avery by his voice as the third man who had entered the car while the victim was locked in the trunk, although that identification was not a positive one. In this context and in light of the defense contention on cross-examination, we think it was not error for the State on redirect examination of Officer Hilbring to allow the officer to reiterate that there was a third man involved in the incident, after the armed robbery had been completed at the lakefront by McReynolds and the "second" man, and that that third man was Carl Avery. As this court said in *People v. Coleman* (1972), 9 Ill.App.3d 402, 406, 292 N.E.2d 483, 486:

> "Defense counsel have wide latitude on cross-examination to ask proper questions which they believe will assist their case; but counsel will not be heard to complain on appeal if unintentionally their questions produce unfavorable answers or if their intentional trial tactics go wrong. In either case, opposing counsel * * * is entitled to respond with appropriate questions."

■■ Defendant's final contention on this appeal is that his minimum sentence of 6 years is excessive and should be reduced by this court to 4 years pursuant to Supreme Court Rule 615(b)(4). (Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(4)). Defendant's suggestion of 4 years may be based on the fact that 4 years is the absolute minimum sentence provided for armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—2(b) and par. 1005—8—1(c)(2)) or perhaps on the notion that the "one-third" ratio of minimum sentence to maximum sentence actually imposed should be extended to armed robbery despite the Legislature's failure so to provide. Our power to reduce sentences which are within the sentencing provisions authorized by law is to be exercised with caution and with deference to the more advantageous position of the trial court in considering the several factors involved in the imposition of sentences. (*People v. Taylor* (1965), 33 Ill.2d 417, 211 N.E.2d 673; *People v. Turner* (1974), 19 Ill.App.3d 697, 312 N.E.2d 421.) On this record we cannot say that the 6-year minimum sentence is excessive or constitutes an abuse of discretion, and we decline to reduce it.

724

For the foregoing reasons, we find no merit in any of defendant's contentions on this appeal, and we affirm the conviction and sentence of the trial court.

Judgment affirmed.

DOWNING, P. J., and LEIGHTON, J., concur.