THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WALTER L. BOYD, Defendant-Appellant.

First District (4th Division)    No. 78-482

Opinion filed September 11, 1980.—Rehearing denied October 9, 1980.

Richard J. Aronson, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Walter Boyd, was convicted of three counts of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and three counts of attempt armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2). He was sentenced to three concurrent prison terms of 100 to 300 years for the murders and three concurrent prison terms of 3 to 15 years for the attempt robbery convictions.

On appeal, defendant contends: (1) he was denied his constitutional

right to a speedy trial; (2) the introduction of an inculpatory hearsay statement deprived him of his constitutional right to confrontation; (3) the trial court erred in ruling that defendant's statements to the police were voluntary and therefore admissible; (4) the trial court erred in admitting into evidence the photographs of the victims; (5) his guilt was not proven beyond a reasonable doubt; (6) the trial court erred in admitting into evidence the weapons found at the scene of the crime; (7) the trial court erred in refusing to admit defendant's testimony about statements made to him by a person who later died; (8) reversible error occurred when the prosecutor cross-examined defendant about pretrial plea bargaining; (9) the trial court erred in unduly restricting the direct examination of a defense witness; (10) reversible error occurred when the prosecutor improperly argued to the jury that defendant was a drug addict; (11) reversible error occurred during closing argument when the prosecutor referred to the grand jury proceedings; (12) the trial court improperly restricted defendant's closing argument; (13) the trial court abused its discretion by refusing the juror's request for transcripts of testimony; and (14) the sentences imposed by the trial court were excessive.

We affirm.

Defendant was convicted of the murder and attempt robbery of three members of the Thomas family: Tyrone and Virginia, the parents; and Michelle, their seven- or eight-year-old daughter. The Thomas' five-month-old baby girl, present at the scene of the slayings, was not harmed.

## The State's Case-in-Chief

At trial,[1] the State's first witness, Larry DePerry, testified that he was an acquaintance of defendant and Tyrone Thomas. On June 29, 1976, after 10 p.m., DePerry went to Tyrone's home to purchase narcotics. Tyrone asked him to go to the store, and DePerry agreed because Tyrone promised "to tighten up the package," which DePerry explained meant Tyrone would give DePerry more drugs.

As DePerry left the Thomas home, he saw defendant standing on the street curb, next to a yellow car. Defendant appeared to be talking with someone who was seated in the car. DePerry nodded to defendant in recognition and noted that defendant wore light colored clothing. Approximately five minutes later, DePerry returned to the Thomas residence. The yellow car was parked in the same location. He did not see the defendant, but he did see a man walking south. DePerry did not recognize this man; he could not see the man's face because he was wearing a hat which covered his eyes. DePerry asserted he was sure this man was not the defendant.

---

[1] For the sake of clarity, the facts relative to defendant's motions for a speedy trial and motion to suppress statements are set forth in those portions of the opinion which relate directly to those contentions.

DePerry continued to walk toward Tyrone's house and, when he arrived at the back door, he rang the bell, but no one answered. He waited 10 to 15 minutes, and then went to a phone booth and telephoned Tyrone, but no one answered the telephone. He returned to Tyrone's home and, not gaining entry, he left. Approximately one or two hours later, DePerry returned again to Tyrone's residence. He first rang the bell at the back door and then went to the front door. DePerry rang the bell and looked through the front glass. After discovering the burglar gates were open, he pushed the door open and saw Tyrone's body lying on the floor. As DePerry continued to push the door open, he saw Virginia and Michelle. Their bodies were on the floor and were stained with blood.

At trial, DePerry identified several photographs of the victims as accurately depicting the victims as he had seen them. DePerry also testified that Tyrone's house had burglar gates across the back and front doors and burglar bars all over the house. DePerry also stated that a person would have to be a good friend of Tyrone to get into the house via the front door.

The State's next witness, police officer Chester Zubrzycki, testified that on the morning of June 30, 1976, he and his partner went to the location of the Tyrone Thomas home. In the hallway, they discovered the body of a man covered with blood. The man's throat had been cut; a cord had been tied around his neck. In the living room, the police officers found the bodies of a woman and a young girl. Both bodies were covered with blood. The young girl's throat had been cut. The police officers also found an infant, who was alive. A dead German Shepherd dog was lying on the floor. Officer Zubrzycki identified several color photographs which depicted the bodies of the victims. The bodies were covered with blood.

Police officer Raymond Peterson testified to the removal of the man's body to the morgue. He also identified a color photograph of the bodies of the woman, the little girl, and the dog. Police officer William Sherlock, a mobile unit technician, asserted that he examined for physical evidence, the bodies of the victims and the scene. The evidence he recovered included a revolver found near Tyrone's body, a pair of scissors found under Virginia's body, a knife discovered partially under Tyrone's body, another knife located on the hallway floor, and another revolver discovered in the front room on the floor under the baby's crib.

Sherlock further stated that samples of blood were obtained from inside the apartment and the front porch. Samples of the victim's clothing were sent to the crime laboratory. Another officer found a blue jacket in a nearby vacant lot. According to Sherlock, the jacket appeared to have bloodstains on it. Sherlock checked all the windows and doors and observed that all were barred and intact. He also identified as an accurate depiction, a photograph of the knife found on the floor near the bathroom and another photograph of the wound in Tyrone's back.

Police officer Richard Binkus testified that on the night of the incident he examined a trail of blood outside the Tyrone Thomas home. The trail consisted of clusters of six to ten drops of blood. Each of the drops was approximately two to three feet apart. In a northerly direction, Binkus followed the trail from the house and then west through a vacant lot to the alley between Wentworth and Wells Streets. The trail continued south through the alley for a few feet and then stopped. Binkus proceeded south in the alley at 45th Street, and found the trail again. Binkus followed the trail into a weeded area in the back of a house at 45th and Wells Streets. There Binkus found a blood-stained light blue jacket. The trail continued southwest and stopped at 45th Street.

Police officer Joseph Pikowski testified that on June 30, 1976, he examined the area around 4442 South Wentworth. He found a blood-stained carving knife between two garages located behind 4423 South Wentworth, approximately six feet from the alley which runs between Wells and Wentworth Streets.

Police officer Patrick McNulty testified that on July 2, 1976, he removed a piece of a living room throw rug and sent it to the crime laboratory. The parties then stipulated that a technician took a blood sample from defendant and determined that he had Type O blood.

Sergeant Donald Smith of the firearms identification unit testified he examined a gun and bullet recovered from the scene of the slayings but he could not make a positive identification because the bullet was mutilated. He also examined a .38-caliber bullet and determined that it had not been fired from the .38-caliber gun recovered at the scene.

A Chicago police department micro-analyst, George Speyrene, testified that he analyzed the blood of the three victims. Both Tyrone and Michelle had Type AB blood; Virginia had Type A blood. Speyrene further stated that the scissors and the knives found in the house and the carving knife found near the alley were stained with Type AB blood. No blood was found on the orange rug sample, but the blue jacket discovered near Tyrone's residence contained orange fibers morphologically similiar to the fibers from the carpet sample.

Speyrene further stated that the collar, right sleeve, left panel and back of the blue jacket were stained with Type O blood. Speyrene further discovered Type AB blood on the jacket's left front panel, front sleeve, and right sleeve. He examined other items but none of these contained Type O blood. The porch outside Tyrone's home was stained with Type B blood. Speyrene asserted that none of the victims had Type O blood.

Dr. Robert Stein testified he removed a small caliber bullet from the head of the dead dog found at the scene of the slayings. Dr. Tai An examined the bodies of the victims. Two bullet wounds were found in Virginia's body; one bullet was found at the base of the nose, and the other

was found in the left occipital area of the skull. The cause of her death was a bullet laceration in the brain. Dr. An further stated that the examination of Tyrone's body revealed that a large slash wound on his neck, three stab wounds on his back and three stab wounds on the left side of his head with scalp lacerations in the same area. Dr. An determined that Tyrone died from the slash wound to the neck which lacerated the carotid artery and the jugular vein. Dr. An also noted that blood could have flowed from the lacerations and cuts he found on Tyrone's head.

Dr. An further asserted that Michelle's neck sustained a large slash wound, her left eyelid revealed multiple contusions, and her left thumb contained cutting wounds. Dr. An determined that Michelle died of head wounds and a slash wound to her neck which lacerated the major branch of the left jugular vein, and larynx. The wounds of Tyrone and Michelle might have been caused by the use of the knife near Tyrone's body and the knife found in the alley.

On cross-examination, Dr. An admitted he could not determine that either knife had actually caused the wounds to the bodies of Tyrone and Michelle. Dr. An also indicated that he had found morphine in the bile of both Tyrone and Virginia. He also informed the jury that heroin produces morphine in the bile.

Police officer John Furmanek testified that on July 7, 1976, at 9:15 a.m., he and his partner, Edward Gallagher, were working in civilian clothes when the defendant and his brother, Alvin, entered the police station. Lieutenant Hensley also was present. In the presence of these police officers and defendant's brother, Furmanek advised defendant of his constitutional rights, and then at approximately 10 a.m. he talked with defendant.

Furmanek related the substance of the 20-minute conversation with defendant. Defendant told him that on the night of the crimes, he went to the front door of the Tyrone Thomas house. Suddenly and without warning, two men pushed him into the house. One man pointed a gun at Tyrone's head and made defendant kneel near the sofa. The other man had a scuffle with Virginia. Someone said, "I want my money," and then someone said, "I'll tighten up with money." Virginia then entered the room with the second man and during the scuffle, a gun fell to the floor. Defendant picked it up and tried to fire a shot, but the gun misfired. A scuffle ensued. Defendant ran out of the house to 45th Street. He noticed he was bleeding. His coat was stained with blood, and he discarded the coat. His hand was bleeding and he wrapped it in his shirt. After riding a bus for two hours, he decided to go to Miami, Florida. He then went to the West Side of Chicago, obtained some clothes, and then took a bus to Miami. He did not notify anyone, and he was not worried because he thought the "dudes" knew Tyrone. Defendant said he did not know the men who had accosted him in front of Tyrone's home. Furmanek also stated that defendant said he

had wanted to get away, "something about someone knowing about Walter doing drugs." Defendant said he learned of the killings on July 2, 1976.

After defendant gave this statement, Furmanek received a call regarding a witness who wanted to talk about a triple slaying he had witnessed. Furmanek went to the Civic Center and, after obtaining Oliver Holiday's release, brought Holiday back to the police station.

Furmanek further testified that after his conversation with defendant, defendant was placed in an interview room and remained there from noon to 3 p.m. At 3 p.m., the police took defendant to another station where he remained with Investigators Rochowicz, Bulger, and Strong.

On cross-examination, Furmanek asserted he did not know how long Oliver Holiday had remained at the police station, who had talked with him, or whether Holiday had made any written statements. Holiday was released from police custody, but Furmanek did not know why Holiday was not arrested after defendant gave a second statement which inculpated Holiday.

Police investigator Rochowicz testified that in the late afternoon on July 7, 1976, he had a conversation with Investigators Strong and Bulger, and with police officers Hensley, Gallagher, and Furmanek. After this conversation, at approximately 5 p.m. or 5:30 p.m., he talked with defendant. Rochowicz and defendant were alone during this conversation. After Rochowicz advised defendant of his rights, defendant gave him a statement.

Rochowicz related the substance of defendant's statement. Defendant went to the Tyrone Thomas house to purchase narcotics. Defendant passed two men who were standing on the street and, as he knocked on the front door, and as he gained entry, the two men pushed him through the door. The men had guns and they first made Tyrone kneel on the living room floor and then tied him with electrical cord. As Virginia ran to the kitchen, one of the men grabbed her, and as they struggled, he dropped the gun. Defendant then picked up the gun, pointed it at the man, and pulled the trigger twice. The gun misfired. The man also had a knife and, during the scuffle, defendant grabbed the knife and cut his hand. He then ran out of the house and proceeded north on Wentworth and west through a gangway. He discarded his jacket because it was full of blood.

Rochowicz further testified that at approximately 6 p.m. Rochowicz talked privately with Holiday. At 6:20 p.m., Rochowicz returned to defendant's interview room. Only he and defendant were present. Rochowicz told defendant what Holiday had said to him. Rochowicz testified Holiday told him that on the night of the incident, defendant went to Holiday's apartment. Holiday said defendant's hand was wrapped with a shirt and Holiday asked defendant what had happened.

The trial court overruled defendant's objection to Rochowicz's testi-

mony as to what Holiday said defendant had said. Rochowicz continued testifying. Rochowicz asserted Holiday told him that defendant had said he had killed two people and had done something he really did not want to do. Rochowicz stated that Holiday said to the defendant, "Well, what can I do * * *?" Holiday told Rochowicz that he told defendant to get out of town. Holiday also told Rochowicz that defendant then said to Holiday, "I'll contact you later."

Rochowicz further testified that after he told defendant what Holiday had said to him, defendant responded that he would tell Rochowicz "what really happened." Rochowicz then related the substance of defendant's conversation. Defendant, Holiday, and two other persons drove a white car to the Tyrone Thomas house to "rip him off," which defendant explained was a robbery. Only defendant and Holiday left the car. After they gained entry and began talking with Tyrone, Tyrone felt something was wrong. Tyrone shouted to Virginia, and Holiday struck Tyrone with a gun. After Tyrone fell to the floor, they used an electrical cord to tie Tyrone. Holiday grabbed Virginia as she came out of the kitchen and forced her back into the kitchen.

Rochowicz further stated defendant told him that as Holiday returned from the kitchen, Holiday told defendant he had everything the Thomases had. At that time, defendant noticed Virginia was bleeding from the head. She attacked defendant with a butcher knife. Defendant grabbed the knife and yelled, "This is too much for me. I am leaving." He left the apartment and went north on Wentworth and west through a gangway. He discarded his bloodstained jacket. He saw Holiday and the other two persons pull up in the car. Defendant joined them, and they went to Holiday's apartment. Holiday gave defendant $100 and told him to get out of town.

Rochowicz testified that between six and eight hours after taking defendant's statement, he typed some notes relating to the conversation. After reading the notes, he prepared the police reports containing all the information he had received during his investigation. He did not keep his original notes.

Several color photographs and weapons found at the crime scene were introduced into evidence over defendant's objections. The State rested. The court denied defendant's motion for a directed verdict. The court granted the State's motion in limine seeking to prevent defendant from introducing statements made by Holiday to defendant during telephone conversations. Defendant objected to the motion and the ruling.

### THE DEFENSE

Defendant testified he met Tyrone Thomas in 1974, and he later hired Tyrone to work the night shift at a service station which defendant oper-

ated. Tyrone and defendant became good friends. Defendant frequented the Tyrone Thomas residence and knew Virginia and Michelle. He also sometimes walked in the park with Tyrone and Tyrone's dog. When defendant learned that Tyrone was a drug dealer, Tyrone's employment was terminated by mutual agreement. Defendant asserted he never used narcotic drugs.

In late 1970 or early 1971, defendant met Holiday. Although they conversed, they did not socialize. After speaking with Holiday on June 27, 1976, defendant called Tyrone and told him he knew someone who wanted to purchase $100 worth of heroin. Holiday and defendant went to Tyrone's house. Holiday gave defendant $100, and defendant went inside Tyrone's home and purchased the heroin. Defendant had told Holiday to remain outside because Tyrone did not like to meet people.

Defendant further stated that on June 29, 1976, at 12 p.m., Holiday telephoned defendant. Defendant then called Tyrone and complained that the drugs purchased for Holiday were "Fried Dormin." Tyrone told defendant he would supply fresh drugs or return the money. In the evening, defendant joined Holiday and two other persons who were riding in a white car. They parked nearby the Tyrone Thomas residence. Holiday insisted that he join defendant, and he went with defendant to the Tyrone Thomas home.

Defendant further testified that as he and Holiday walked towards the Thomas residence, he saw Larry DePerry and nodded in recognition. After they arrived at Tyrone's residence, defendant rang the bell. When Tyrone looked out the window, defendant stepped back under the street light so that Tyrone could see him. Tyrone unlocked the gate and the door. Defendant went inside the apartment. Holiday remained on the porch.

Suddenly, defendant heard Tyrone say, "What is this?" Tyrone called out to Virginia. Defendant saw Holiday. Holiday had a gun and he hit Tyrone in the head two or three times. Holiday then pushed Tyrone towards the defendant and Tyrone fell against defendant's chest. Defendant asserted that prior to this time, he had no knowledge that Tyrone had a gun. Defendant never considered robbing Tyrone. Defendant yelled to Holiday, "What are you doing?" and Holiday responded that he had come for his money.

At this point, Virginia entered the room. She had a gun, and Holiday told her to drop the gun or Tyrone would die. Virginia dropped the gun. Holiday told Tyrone to lie on the floor. Holiday then pulled the telephone cord out of the wall, gave the cord to defendant and ordered him to tie Tyrone's hands. Holiday told Virginia to get him "everything they had." Virginia went into the bedroom. As defendant tied Tyrone with the cord, he tried to convince him that he had nothing to do with the robbery. Defendant did not tie a knot in the cord he placed around Tyrone's hands.

Defendant further testified that throughout the robbery Holiday had a gun in his hand and he never let defendant move outside of his sight. After Virginia handed something to Holiday, she went towards defendant. She had a knife and, as she swung it at him, defendant grabbed the blade and said to her, "Can't you see, I don't have nothing to do with this?" Defendant then ran to the porch. As he jumped over the porch railing, he heard a gunshot. He ran north, away from the car, and then ran west through a vacant lot to the alley. He proceeded south through the alley. As he ran, he removed his jacket and threw it into the lot at the end of the alley. He wrapped his bleeding hand in his shirt. He did not have a knife.

Defendant stated that later he tried to telephone both Holiday and Tyrone, but he could not get a response from either person. He decided to buy a ticket to Miami Beach and remain there until he could "straighten out" the matter. He first went to his brother's apartment on the west side of Chicago and obtained some clothes. He then took a bus to Florida and stopped in Daytona Beach, Florida. He called Holiday, who assured him the gunshot he had heard was nothing. Holiday told defendant to get in touch with him when he returned to Chicago.

After defendant returned to Chicago, he met with his brothers Robert and Alvin. They told defendant the police and the Blackstone Rangers were looking for him. They also advised defendant to surrender to the police to obtain protection. Alvin took defendant to a hotel where he remained for a few days. On July 7, 1976, defendant, accompanied by his brothers Alvin and Nathaniel, walked into a police station.

Defendant further asserted that Officer Furmanek then took defendant and his brothers into a room. After Furmanek advised defendant of his rights, he asked defendant to tell him about the incident. Defendant admitted he told Furmanek an untrue story. Between 11:30 a.m. and 12 p.m., several of the police took defendant upstairs and they began talking about the Blackstone Rangers.

Defendant testified the police asked whether he knew that Mickey Cogwell, the leader of the Blackstone Rangers, a street gang, had been calling the police station. The police expressed the view that defendant should be "turned over" to the Rangers. Defendant remained handcuffed in the room for three hours; he was not given any food. Sometime after 3 p.m., the police transported him to another location. He was handcuffed to the radiator and was not given any food until 7 p.m. that evening.

The defendant denied making a statement to Investigator Rochowicz in which he admitted planning and participating in a robbery. Defendant stated he did not plan to rob the Tyrone Thomas family, nor did he kill them. On cross-examination defendant admitted he had never called the police, although he had heard a gun fire and knew Larry DePerry had

observed him at the scene. Defendant also acknowledged that while he was in Florida, he telephoned only Holiday, not Tyrone.

Defendant also stated that he was frightened of the Blackstone Rangers, but he did not ask the police for help. He also asserted that on the night of the incident, he did not see Michelle, the baby, or the dog in the apartment.

Police officer Thomas Brankin was called as a defense witness. The State objected to the officer's testimony. During a *voir dire* examination, outside the jury's presence, Brankin testified he had been assigned to investigate the death of Oliver Holiday on July 29, 1976. Brankin admitted that no police officer requested a determination of Holiday's blood type. At the Holiday inquest, Brankin testified that Holiday's death normally would have been a routine drug overdose matter but that it was not routine because Holiday was a witness to a murder.

Brankin testified before the jury that he had investigated Holiday's death and had been informed that Holiday was a witness to a triple murder of the Tyrone Thomas family. Brankin also asserted he had no personal knowledge whether Holiday's blood type had been determined.

The defense also called Dr. An as a witness. He stated that on July 30, 1976, he examined Holiday's body and, in his opinion, the cause of death was habitual use of morphine. Although Dr. An drew a blood sample from Holiday's body, he did not submit the sample for testing because he was not asked to do any crime laboratory bloodwork in conjunction with the Holiday autopsy.

Defendant's brother, Alvin, also testified as a defense witness. He related that the police had been looking for defendant, and they told him that the Blackstone Rangers wanted to kill the defendant because he had killed Tyrone, who was a drug dealer for the gang. Alvin saw defendant on July 3, 1976, and communicated this information to him. On July 7, 1976, he accompanied defendant to the police station and remained with defendant while defendant told the police the false version of the incident. Earlier, defendant had told Alvin the same story, and Alvin did not know the story was untrue.

Three character witnesses also testified to defendant's reputation in the community as a peaceful and law-abiding citizen. The defense rested.

## The State's Rebuttal

In rebuttal, Assistant State's Attorney Gary Griffith testified that on July 7, 1976, at 7 p.m., he talked with defendant in the presence of Investigator Rochowicz. Defendant told him that on the night of the incident, defendant, Holiday, and another person named Ben, went to the Tyrone Thomas home to rob Tyrone. When Griffith asked defendant who set it up,

defendant told him they did. Defendant was picked up in a white car, and the group parked the car south of the Tyrone Thomas residence.

Griffith further stated that defendant told him he and Holiday then walked to the door of the apartment. Defendant knocked; Holiday hid from view. After Tyrone answered the door, Holiday ran up the stairs and hit Tyrone in the head. He and defendant then took Tyrone into the living room and tied him with a telephone cord. Holiday struck Tyrone with a gun and then took Virginia into the bedroom. When Holiday and Virginia returned, Virginia's head was bleeding and Holiday said, "I've got all they have." Virginia then lunged with a carving knife at defendant. Defendant struggled to obtain the knife and cut himself as he pulled it away from her. Defendant became frightened, ran out the door, and as he ran north, he heard a gunshot. Later, defendant met Holiday and received his $100 share.

On cross-examination, Griffith asserted that while he was questioning defendant, defendant told him he had set up the robbery. Upon further questioning, Griffith admitted that the police report which he had prepared reported, "I [Griffith] stated that he had set it up to rob Tyrone Thomas."

The State then rested; defendant's motion for a directed verdict was denied. After closing arguments, the jury was instructed. Approximately 3½ hours after the jury retired to deliberate, the trial judge received three requests for transcripts of trial testimony: two of the requests were for defendant's testimony; one request was for all the testimony. After discussion with counsel, the court advised the jury, in writing, that they must base their verdicts on the testimony they heard, the stipulations, and the exhibits received in evidence. The jury returned guilty verdicts.

Defendant was subsequently sentenced to three prison terms of 100 to 300 years for the murders and three prison terms of 3 to 15 years for the attempt robberies, all terms to run concurrently.

Defendant appeals his convictions.

OPINION

I

■■ Defendant first contends the trial court erred in denying his motion for discharge. With respect to offenses committed prior to March 1, 1977, the four term act (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a), (d), (f)) provides in pertinent part:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody * * *.
>
> * * *
>
> Every person not tried in accordance with subsections (a), * * * of this Section shall be discharged from custody * * *.

\* \* \*

> Delay occasioned by the defendant shall temporarily suspend for the time of the delay the period \* \* \* and on the day of expiration of the delay the said period shall continue at the point at which it was suspended. \* \* \*"

In accordance with the statute, where a defendant, by his own actions, causes a delay in trial, the statutory period is tolled and begins to run anew from the date to which the case has been delayed. *People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776; *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469.

Thus, our inquiry in the instant case is whether an act of defendant, or some act to which he consented, necessitated a "slowdown" in the judicial process so as to delay his trial. *People v. Jones* (1971), 130 Ill. App. 2d 769, 266 N.E.2d 411.

Defendant was arrested on July 9, 1976, and remained in custody until the trial began on August 9, 1977. The trial was continued "by agreement" of the parties four times between July 29, 1976, and November 24, 1976. On October 20, 1976, defense counsel informed the trial court that he was compelled to agree to a continuance because the State had not yet tendered all of the requested discovery materials. On November 24, 1976, defendant filed his petition for discharge, and by agreement of the parties, the hearing was set for December 8, 1976. On December 8, 1976, defense counsel agreed to continue the case to December 22, 1976, and restated his position that he was compelled to do so since he had not obtained certain discovery materials. Defense counsel maintained that he could not answer, in good faith, that he was ready for trial, nor could he adequately represent his client in view of the State's failure to comply with discovery requests.

On December 22, 1976, a different trial judge heard arguments on defendant's motion for discharge. By order of the court, the case was continued to December 28, 1976. On that date, the trial judge denied defendant's motion. The court reasoned that every continuance was "by agreement" and defense counsel, a "seasoned criminal lawyer," understood the legal meaning of these words. Defendant argues here, as he did in the trial court, that since he was forced to choose between his right to a speedy trial and the right to effective assistance of counsel, he was denied the right to a speedy trial when he elected not to proceed to trial unprepared. We disagree.

Our supreme court has rejected the notion that defendant's right to a speedy trial is violated when the case is continued to allow defendant to prepare for trial:

> " 'To argue that he was forced to choose as he did is to argue technicalities. The right to a speedy trial and the right to avoid a precipitous trial are separate but related rights. Both are designed to

assure an accused a fair trial, to prevent undue delay in one instance and undue haste in the other. He can demand action or avoid action as the exigencies of his situation may dictate. But fairness and justice are not a one-way street. * * * The fact that on occasion the accused might have to jeopardize the legislative benefits of the four-month rule by asserting his right to a continuance does not entail a denial of his right to a speedy trial. * * * The election was defendant's to determine on the basis of what would better insure him a fair trial, and, having chosen to proceed, his present argument is nothing more than technical obfuscation.' "

*People v. Lewis* (1975), 60 Ill. 2d 152, 156-57, 330 N.E.2d 857, 860, quoting *People v. Johnson* (1970), 45 Ill. 2d 38, 43-44, 257 N.E.2d 3, 7. *Cf. McGautha v. California* (1971), 402 U.S. 183, 29 L. Ed. 2d 862, 91 S. Ct. 2273, (criminal law is replete with situations requiring difficult judgments as to course to follow and even though defendant has constitutional right to follow whichever course he chooses, the Constitution does not always forbid requiring him to choose).

Similarly, in *People v. Bradley* (1976), 43 Ill. App. 3d 463, 357 N.E.2d 696, the court considered defendant's claim that by reason of the State's lack of diligence with his discovery requests, he was compelled to elect between proceeding to trial unprepared and seeking a continuance which would toll the 120-day period for purposes of discharge. The appellate court rejected defendant's argument, stating:

"This contention cannot be sustained in light of *People v. Williams* (1974), 59 Ill. 2d 402, 320 N.E.2d 849. There, it was held that even a single day preparation time before the expiration of the 120-day limit is not a denial of due process when the defendant can, but fails to seek a continuance. It follows that the election to which the defendant was put violates no constitutional guarantee." 43 Ill. App. 3d 463, 467, 357 N.E.2d 696, 699-700; *cf. People v. Hunter* (1978), 61 Ill. App. 3d 588, 376 N.E.2d 1065; *People v. Lee* (1975), 27 Ill. App. 3d 712, 327 N.E.2d 574.

We also note that Illinois has procedures which defense counsel could have utilized to compel the State to comply with his discovery requests (Ill. Rev. Stat. 1975, ch. 110A, par. 415(d), (e), (f), (g)) and to obtain sanctions against the State for refusal to comply with a discovery order. (Ill. Rev. Stat. 1975, ch. 110A, par. 415(g)). In our opinion, defendant was not compelled to agree to continuances to obtain discovery material.

Accordingly, we hold that by agreeing to these continuances rather than demanding trial, defendant contributed to the delay of the trial, and the trial court properly denied the motion for discharge (*People v. Criss*

(1977), 45 Ill. App. 3d 973, 360 N.E.2d 543; see also *People v. Green* (1962), 23 Ill. 2d 584, 179 N.E.2d 644).

■■ Likewise, we believe the trial court correctly denied defendant's renewed motions for discharge on February 3, 1977, and April 15, 1977. Since defense counsel agreed to continue the case to November 24, 1976, the statute was tolled, and a new statutory period began to run on that date. On December 28, 1976, defense counsel requested a continuance to February 3, 1977. On February 14, 1977, defense counsel again moved for a continuance to February 25, 1977. Where the cause is continued on motion of defendant or his counsel, the motion for discharge will not be allowed if trial is held within four months of the date to which the case was continued, even if it is more than four months after the initial arrest. *People v. Rogers* (1963), 26 Ill. 2d 599, 188 N.E.2d 22.

On February 25, 1977, defense counsel indicated he was ready to proceed on a motion to suppress defendant's statement to police officers. The motion had been filed February 16, 1977. After four police officers testified, the parties agreed to continue the case to March 18, 1977. On March 18, 1977, two more police officers testified. The parties agreed to examine two additional officers on March 22, 1977. On that date, the State moved to continue the case because the officers were unavailable. On April 4, 1977, after lengthy examination of two more witnesses, the parties agreed to continue the case to April 13, 1977, and again to April 15, 1977. On April 15, 1977, the court denied defendant's motion to suppress and his renewed motion for discharge.

We believe the trial court's ruling was correct. Even if we do not consider the various "by agreement" continuances, defendant's new term commenced on February 25, 1977, the date to which the case was continued on defendant's motion, and his motion to discharge made on April 15, 1977, was premature. Further, the hearing on defendant's motion to suppress between February 25, 1977, and April 15, 1977, was a delay attributable to defendant. *People v. Kemp* (1977), 49 Ill. App. 3d 270, 364 N.E.2d 944.

■■ The law is clear that where a defendant files a motion, such as a motion to suppress, he is ordinarily chargeable with the delay occasioned by the filing of that motion. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776; *People v. Puyear* (1977), 48 Ill. App. 3d 183, 362 N.E.2d 1113.) The often expressed rationale for this rule is that the State is entitled to some time to prepare for a hearing on the motion to suppress and that the defendant has the primary obligation to call the motion for hearing and disposition. (*People v. Donalson.*) In resolving whether a delay resulting from a motion to suppress is attributable to defendant, much deference must be given to the trial court's judgment. (*People v. Keagbine* (1979), 77

Ill. App. 3d 1039, 396 N.E.2d 1341.) As stated in *People v. Thomas* (1975), 25 Ill. App. 3d 88, 91, 322 N.E.2d 597, 599:

> "Whether a motion falls into the category of one which would cause little delay or much delay calls for the trial court's appraisal of the motion, its need, timeliness and complexity. It calls for the court's appraisal of the State's ability to answer the motion immediately or the merit of the State's reasons for not doing so. The interpretation of the motion and of the availability of the required information, the reasonable time needed to answer and whether the proposed objections are genuine or dilatory should rest in the judgment of the trial court, and its decision as to accountability for the ensuing delay, if there is one, should be sustained on appeal unless it is clearly shown that the court's discretion was abused."

We do not believe that the trial judge abused his discretion in attributing this delay to defendant. Thus, a new term began on April 15, 1977, when the trial court disposed of the motion (*People v. McKinney* (1978), 59 Ill. App. 3d 536, 375 N.E.2d 854), and it ended on August 9, 1977, when the jury was selected (*People v. Williams* (1974), 59 Ill. 2d 402, 320 N.E.2d 849). Accordingly, we conclude defendant was not denied his statutory right to a speedy trial.

We also hold that defendant was not denied his constitutional right to a speedy trial (U.S. Const., amend. VI). The right to a speedy trial "necessitates a functional analysis of the right in the particular context of the case '* * *. It is consistent with delays and depends upon circumstances.' " (*Barker v. Wingo* (1972), 407 U.S. 514, 522, 33 L. Ed. 2d 101, 112, 92 S. Ct. 2182, 2188.) In *Barker*, the Supreme Court adopted a balancing test to determine whether the right to a speedy trial has been denied. The factors to be considered are (1) length of delay; (2) reason for delay; (3) defendant's assertion of the right; (4) prejudice to defendant. (407 U.S. 514, 530, 33 L. Ed. 2d 101, 116-17, 92 S. Ct. 2182, 2191.) We will consider these factors in light of the circumstances of the case.

Defendant's arrest and subsequent incarceration occurred on July 7, 1976. The trial began on August 9, 1977. A total of 19 continuances was granted. The State moved for two continuances. The State's first continuance was due to the unavailability of two police officers for the motion to suppress hearing[2] and the second was due to a conflicting trial date of one of the prosecutors. We need not decide here whether these reasons alone would justify delay since we previously have decided that defendant agreed to 12 continuances and moved for two continuances.

---

[2] The record discloses that these officers never testified and, at the continuation of the hearing, the State argued these officers' testimony was not necessary to sustain the State's burden of a prima facie showing of voluntariness. Thus, this continuance has the appearance of being a dilatory tactic.

Defendant was arraigned on July 29, 1977, and first demanded trial on December 8, 1977. On appeal, defendant argues he was prejudiced but fails to assert specific details of prejudice. Defense counsel agreed to the continuances because he was not prepared for trial. In fact, the delay provided defense counsel with time to adequately prepare a defense. Under the circumstances of this case, particularly where defendant's acquiescence in the delay of the trial is indicated, we find no violation of defendant's constitutional right to a speedy trial. See *People v. Young* (1970), 46 Ill. 2d 82, 263 N.E.2d 72.

## II

■■ Defendant next contends that reversible error occurred when the trial court permitted police officer Rochowicz to testify about Oliver Holiday's statements which implicated defendant. The defendant argues that this testimony violated his sixth amendment right (U.S. Const., amend. VI) to confrontation in violation of *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.[3] *Bruton* holds that the introduction of an out-of-court statement by one co-defendant which implicates a second co-defendant violates the latter's right of confrontation when the co-defendant who made the statement cannot be subjected to cross-examination at trial.

Thus, the *"Bruton* rule" is violated only where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for full and effective cross-examination. (*Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723; *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) A conviction, however, is not automatically reversed upon the finding of a *Bruton* violation. When properly admitted evidence of guilt is overwhelming, for example, when defendant has confessed to committing the crime and the prejudicial effect of the admission of the out-of-court statement is insignificant by comparison, the error is considered harmless error beyond a reasonable doubt. *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; see also *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132; *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.

---

[3] The State does not address defendant's constitutional argument but rather urges that Rochowicz's hearsay testimony about Holiday's statement was admissible because the State only intended to show that the statement was made and not to show the truth of the matter asserted in the statement. To accomplish this goal, Rochowicz only had to testify to the *fact* that a conversation with Holiday took place and that defendant changed his story after being told what Holiday said. The *substance* of Holiday's statement was unnecessary and clearly was inadmissible hearsay.

Also, our supreme court has held that no violation of the *Bruton* rule occurs when the defendant claiming the benefit of the rule has made a similar inculpatory admission. (*People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359; *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136.) Although here, defendant's inculpatory statement to the police differed from Holiday' s statement implicating defendant, the prejudicial impact of Holiday's out-of-court statement was insignificant when compared with defendant's admission. Both police officer Rochowicz and Assistant State's Attorney Griffith testified that defendant admitted to them that he and Holiday went to the Thomas residence to rob Tyrone Thomas. This admission, coupled with the circumstantial evidence adduced at trial, renders harmless beyond a reasonable doubt any error that may have occurred from the admission of Holiday's statement. *People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359; *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.

## III

■■ Defendant next contends that the trial court erred in denying his motion to suppress statements which he gave to the police because (a) the State failed to produce all material witnesses connected with the statements and failed to explain their absence, and (b) defendant's statements were coerced by the police and therefore were involuntarily made and inadmissible at trial.

The statute relied upon by defendant provides in pertinent part:

"The motion [to suppress a confession] shall be in writing and state facts showing wherein the confession is involuntary.
   *   *   *
The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State. Objection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court." Ill. Rev. Stat. 1977, ch. 38, par. 114—11(b), 114—11(d).

It is well settled in Illinois that to discharge its burden of proving that a confession was voluntary, the State must produce all material witnesses connected with an allegedly involuntary confession or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712.) " '[T]he persons who must be called as witnesses or whose absence must be explained are those persons whose testimony would be material on the issue of the voluntary nature of the confession' (*People v. Sims* (1961), 21 Ill. 2d 425, 432.)" *People v. Armstrong* (1972), 51 Ill. 2d 471, 476, 282 N.E.2d 712, 715.

We believe the State met its burden of producing all material witnesses to the statements made by defendant. At the hearing on the motion to

suppress the statements, four police officers and two assistant state's attorneys testified. Two police officers, Furmanek and Gallagher were not called as State's witnesses although they were present with Lieutenant John Hensley when defendant gave his first statement. Hensley, however, did testify to the circumstances surrounding the statements given by defendant.

Hensley asserted that on July 7, 1976, defendant, accompanied by his brother, Alvin Boyd, walked into the police station. After defendant was arrested, Officer Furmanek advised defendant of his constitutional rights and defendant indicated he understood these rights. Defendant and Furmanek then talked for 10 to 15 minutes. During this time, no one threatened defendant; no one told defendant he would be released to the Blackstone Rangers if he did not give a statement. Alvin Boyd remained with defendant during this conversation.

At 12 p.m. the same day, Furmanek and Gallagher again talked with defendant in the presence of Lieutenant Hensley and Investigators Strong and Bulger. Alvin Boyd was not present during this conversation. Both Strong and Bulger testified to the circumstances surrounding this conversation.

Strong asserted he advised defendant of his rights and then talked with defendant approximately two hours. During this time, no one struck defendant, threatened to kill him, or told him he would be killed or his family harmed if he was released from police custody. Bulger's testimony concerning the circumstances of the conversation was substantially the same. Bulger asserted that while defendant was being interrogated, neither he nor anyone else present told defendant that the Rangers or Mickey Cogwell, the Rangers' leader, were looking for him.

Both Bulger and Strong stated that they had heard a rumor that Mickey Cogwell was looking for defendant. Strong stated that when he talked with defendant's mother a few days before defendant surrendered, she was told defendant would be "better off" if he surrendered to the police rather than remaining "on the street." Defendant's mother said she would discuss the matter with her family and give defendant the message. Bulger also testified it was rumored that Mickey Cogwell was upset about the murder of a seven-year-old girl and he was looking for the offender. Bulger did not recall telling defendant's mother about the rumor, but he did recall telling Alvin Boyd about the rumor.

Both Strong and Bulger stated that while interrogating defendant, no one told defendant Mickey Cogwell and the Rangers were looking for him. On cross-examination, however, Bulger answered affirmatively when asked whether "it was possible" that he said to the other officers, in defendant's presence, "Let's let him out on the street and get what he's got coming."

Investigator Richard Rochowicz testified that at 5 p.m. he advised

defendant of his rights and talked with him. No one threatened him. At 6:30 p.m. Rochowicz again advised defendant of his rights and talked with defendant in Assistant State's Attorney Gary Griffith's presence. No one threatened defendant or his family. At 7 p.m., Rochowicz and Assistant State's Attorney Louis Buffardi had another conversation with defendant after advising him of his rights. Defendant never complained that anyone threatened him, nor did anyone tell him he or his family would be harmed. When Griffith first questioned defendant, he asked whether anyone had threatened him, and defendant responded that no one had.

Griffith and Buffardi both asserted that no one told defendant the Rangers or Mickey Cogwell were looking for him. They also stated that defendant never complained that he or his family had been told that police custody would be safer because the Rangers were looking for him. The subject of the Rangers was never discussed.

At the close of the State's presentation, defendant objected to the State's failure to produce Furmanek and Gallagher as witnesses. The court ruled the State had established, by a preponderance of the evidence, that defendant's statements were voluntary in nature. The court informed defendant:

> "The Court feels that particularly inasmuch as the State has indicated its willingness to produce both Officers Furmanek and Gallagher at some time when their testimony would be material, if the defense goes forward and introduces any evidence whatsoever that there was any coercion, or threats, or abuse made by these police officers, that they would then be called to testify either in support of the claim of the defendant, or as rebuttal witnesses."

Defendant presented the testimony of his brothers, Alvin and Robert Boyd. Defendant did not testify in his own behalf. Both Alvin and Robert asserted the police contacted them on numerous occasions and told them that the Rangers were looking for defendant and that he would be safer in police custody. The last time they saw the police was July 2, 1976. On July 3, 1976, Alvin told defendant the Rangers were out to kill him and the police would shoot if he tried to get away. On July 6, 1976, Robert again conveyed this information to defendant.

Alvin also testified that on July 7, 1976, he accompanied defendant to the police station. He remained with defendant while defendant gave the police a statement, after the police had advised defendant of his rights. During this time, he did not see the police strike defendant. Alvin did not testify that the police discussed the Rangers with defendant while they were questioning defendant. Alvin also stated that he and defense counsel had a conversation with a police officer, outside the presence of the defendant. The police officer allegedly told them they should persuade defendant to talk to the police because if defendant was released, he would

be killed by the Rangers. The officer also said the police would protect defendant if they knew what had happened.

The trial court denied defendant's motion to suppress because defendant had not established that his statements had been induced by police coercion. The trial court noted that since defendant did not testify, the court could only speculate as to the effect of the rumors on defendant's state of mind.

### (a)

We believe the State produced the material witnesses necessary to discharge its burden of establishing the voluntariness of defendant's statements to the police. Although Furmanek and Gallagher were present during two different conversations with defendant but did not testify at the hearing, the other officers who participated in those conversations did testify. Further, there was no evidence that Furmanek or Gallagher threatened defendant or that their testimony would have differed from that of the officers who did testify. (*People v. Weathers* (1974), 18 Ill. App. 3d 338, 309 N.E.2d 795.) Accordingly, we conclude their testimony was not material to establishing the voluntary nature of defendant's statements to the police. *Cf. In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753.

In our view, defendant's reliance on *People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712, is misplaced. There, defendant testified he had been beaten by several police officers. Defendant's mother, stepfather, sisters and girlfriend also stated that they saw defendant after his interrogation and he was bruised badly, while he had not been bruised before his arrest. The State's refusal to call two officers as witnesses was reversible error since their testimony was material. One of the officers allegedly had beaten defendant and another conducted the interrogation which led to defendant's first oral confession.

In marked contrast to *Armstrong*, here there was no evidence that Furmanek or Gallagher threatened, coerced, or intimidated defendant. In fact, Alvin Boyd, who was present when defendant gave his first statement to Furmanek, Gallagher and Hensley, did not testify to any type of coercion exerted upon defendant. Under these circumstances, we conclude neither Furmanek nor Gallagher was a material witness.

### (b)

■■ We also find the trial court's determination that defendant's statements were given voluntarily to the police is not against the manifest weight of the evidence. In determining whether the State has sustained its burden of demonstrating that the evidence as a whole discloses a statement was made voluntarily, the trial court need not be convinced beyond a reasonable doubt. The trial court's finding will not be disturbed on review unless it is

contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601; *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68.

When a defendant challenges the voluntariness of his statement, the State first must show that, prior to interrogation, defendant was adequately warned of his right to counsel and his privilege against self-incrimination. (*People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.) "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel. [Citation.]" *Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.

Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Admonitions to tell the truth and advisement to make statements are not considered sufficient in themselves to render a statement involuntary. *People v. McCue* (1977), 48 Ill. App. 3d 41, 362 N.E.2d 760; *People v. Jones* (1972), 8 Ill. App. 3d 849, 291 N.E.2d 305.

In the instant case, the evidence defendant presented did not rebut the police officer's testimony concerning the circumstances surrounding the interrogation. The four police officers and two assistant state's attorneys asserted unequivocally that defendant had not been threatened, coerced, or intimidated at any time during the interrogation.

Defendant did not testify, and the testimony of his brothers did not reveal any police coercion. Their testimony revealed only that the police had communicated rumors to defendant's family and urged them to help the police locate defendant for his safety. Neither brother asserted that the police had fabricated the rumors to induce statements. The police officer's testimony that there were rumors in the neighborhood remains uncontested.

Further, that the police communicated these rumors to defendant's family and these rumors induced defendant to surrender voluntarily to the police do not render involuntary defendant's later statements, since defendant was admonished repeatedly of his rights. Since defendants did not present any evidence of coercion during his interrogation, we conclude the trial court's determination of voluntariness was not against the manifest weight of the evidence.

## IV

■■ Defendant next contends that the trial court erred in allowing the admission into evidence of certain photographs depicting the deceased victims and the murder scene. Defendant claims that the photographs were

immaterial and, additionally, were highly prejudicial. In *People v. Foster* (1979), 76 Ill. 2d 365, 375-76, 392 N.E.2d 6, 10, our supreme court recently cited, with approval, the rules regarding admissibility of photographs as set forth three decades ago in *People v. Jenko* (1951), 410 Ill. 478, 482, 102 N.E.2d 783, 785:

> " 'Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. * * * [Q]uestions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant.' "

Here, defendant claims the trial court abused its discretion in admitting six photographs which depict the bodies of the three victims as they were found. One of the photographs shows Tyrone's body lying on the floor and blood splattered on the walls and the floor. Another displays the stab wounds in Tyrone's back, and another portrays a knife lying on the hallway floor. All the photographs were in color.

The State argues that the six photographs were probative of the method used to kill the victims, the amount of force exerted to overpower and subdue the victims, and the amount of blood splattered on the walls which also infers blood was splattered on the killers. At trial, defendant claimed he had fled the Thomas home before any stabbing or shooting occurred but that Oliver Holiday remained at the scene. Defendant's position is that Holiday alone murdered the victims. Thus, the State argues the photographs are relevant to the question of whether one or two persons participated since the pictures depict the amount of force used.

We agree with the State. While the pictures are gruesome, they accurately depict the victims of a grisly crime. None of the photographs was taken after the injuries had been distorted by an autopsy procedure as in *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827; *People v. Jackson* (1956), 9 Ill. 2d 484, 138 N.E.2d 528; or *People v. Landry* (1977), 54 Ill. App. 3d 159, 368 N.E.2d 1334. Defendant's reliance on the foregoing cases is misplaced. Likewise, the fact that there had been prior extensive oral testimony describing the murder scene does not, in and of itself, render the photographs inadmissible. (See *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.) "The major bulwark against prejudicing the jury is the sound discretion of the trial judge." (*People v. Foster* (1979), 76 Ill. 2d 365, 378, 392 N.E.2d 6, 11.) Here, the photographs were probative of the

method and manner of the murder. We hold the admission of the photographs was proper and did not evince an abuse of discretion by the trial court.

## V

■■ Defendant next contends the evidence was insufficient to prove he was guilty beyond a reasonable doubt. The State argues the evidence sufficiently proved defendant's participation in an attempted armed robbery. Since defendant participated in a forcible felony which resulted in killing, the State contends defendant is accountable for the murders under the Illinois felony murder rule. We agree.

The Criminal Code of 1961 provides in pertinent part:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
* * *

(3) He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a))3).)

"A person is legally accountable for the conduct of another when:
* * *

(b) The statute defining the offense makes him so accountable; or

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or.commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(b), (c).

In *People v. Smith* (1974), 56 Ill. 2d 328, 307 N.E.2d 353, the supreme court upheld defendant's murder conviction under the felony murder rule. In *Smith*, a resident of the apartment which defendant was burglarizing jumped from a window and died. The court stated that whether the killing was intentional or accidental was immaterial since the death occurred during the commission of a forcible felony. The court concluded:

" 'It reasonably might be anticipated that an attempted robbery would meet with resistance, during which the victim might be shot either by himself or someone else in attempting to prevent the robbery, and those attempting to perpetrate the robbery would be guilty of murder.' It is unimportant that the defendant did not anticipate the precise sequence of events that followed upon his entry into the apartment of Judy Tolbert. His unlawful acts precipitated those events, and he is responsible for the consequences." 56 Ill. 2d 328, 333-34, 307 N.E.2d 353, 355-56.

In the instant case, both Rochowicz and Griffith testified that defendant admitted he planned and participated in the attempted robbery of

Tyrone Thomas. These admissions were direct evidence of his guilt of attempt armed robbery. (See, *e.g.*, *People v. Panus* (1979), 76 Ill. 2d 263, 391 N.E.2d 376.) Whether defendant or Holiday did the killing is immaterial since "[it] is unimportant that defendant did not anticipate the precise sequence of events that followed upon his unlawful entry into the apartment * * *. His unlawful acts precipitated those events, and he is responsible for the consequences." *People v. Smith* (1974), 56 Ill. 2d 328, 333-34, 307 N.E.2d 353, 355-56.

Further, circumstantial evidence linked defendant to the crimes. A conviction may be sustained upon circumstantial evidence as well as direct evidence. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.) Defendant admitted being present at Tyrone's home on the night of the incident. His bloodstained jacket was found near the home. A carving knife also was found in the same vicinity. Both objects were stained with type AB blood, the blood type of both Michelle and Tyrone.

The jury also could have considered evidence of defendant's flight from Chicago to Florida. (*People v. Pierce* (1975), 26 Ill. App. 3d 550, 325 N.E.2d 758, *aff'd* (1976), 62 Ill. 2d 223, 341 N.E.2d 705.) While defendant testified he went to Florida to "straighten things out," both Rochowicz and Griffith testified he told them he went to Florida after receiving his $100 share from the robbery. This testimony created an issue of credibility for the jury to resolve (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666), and we cannot say the jury's assessment of the credibility of the witnesses was in error. The evidence presented at trial was sufficient, beyond a reasonable doubt, to sustain defendant's convictions.

## VI

■■ Defendant next contends the trial court improperly admitted into evidence the weapons found at the scene of the crime. Defendant argues that there was no evidence adduced at trial which connected the weapons to the crime or to defendant. The State argues the weapons were admissible since defendant admitted he was present at the scene of the crime where the weapons were recovered.

At trial, the State introduced six weapons: a loaded .38-caliber hand gun found in the front hallway of the house near Tyrone's body; two knives, one discovered under Tyrone's arm and the other in the hallway; a .22-caliber hand gun, containing two live and three spent cartridges, found under a baby crib in the front room; and a carving knife recovered between two garages, approximately six feet from an alley behind 4434 Wentworth Avenue.[4] Type AB blood was found on each weapon.

Defendant concedes that the test to determine the admissibility of evidence is whether it is relevant and that weapons introduced into

---

[4] The Tyrone Thomas home was located at 4442 Wentworth.

evidence are relevant "if there is evidence to connect [the weapons] with the defendant and with the crime." *(People v. Jones* (1961), 22 Ill. 2d 592, 599, 177 N.E.2d 112, 116; see also *People v. Gonzales* (1968), 40 Ill. 2d 233, 239 N.E.2d 783.) Defendant asserts that the State failed to show that the weapons were connected to him or the crime since neither his fingerprints nor his blood were found on the weapons which were introduced at trial.

While it is true that the weapons were not covered with defendant's blood or fingerprints, it does not necessarily follow that the weapons were not connected to defendant or to the crime. We believe there was sufficient evidence to connect the weapons to both defendant and the crime. All of the weapons were found at or close to the scene of the crime and all were stained with Type AB blood, the blood type of two of the victims, Tyrone and Michelle Thomas. At trial, a pathologist testified that two bullets were recovered from the body of Virginia Thomas. The pathologist also stated that the bodies of Tyrone and Michelle Thomas had been stabbed and slashed. Defendant admitted he and Holiday were present in the Tyrone Thomas home prior to the murders that night. Defendant also stated while he was in the home that night, Virginia had cut him with a knife. Defendant also testified that on the night of the incident he had run through the alley where the carving knife was later found, although he denied he had thrown any knife there.

We believe this evidence sufficiently connects the weapons to both defendant and the crime; it was within the province of the jury to weigh this evidence and it was up to the jury to give such weight to that evidence as was reasonable in its view. We therefore hold that the trial court correctly admitted into evidence all of these weapons.

## VII

■■■ Defendant next contends that the trial court erred in granting the State's motion in limine to exclude defendant's testimony concerning statements Oliver Holiday made to defendant. The State argues that defendant has waived this issue on appeal since he failed to include the error in his oral post-trial motion. We agree.

All errors are preserved for review by an oral post-trial motion unless the State objects to such procedure. *(People v. Robinson* (1960), 21 Ill. 2d 30, 171 N.E.2d 11, *cert. denied* (1961), 365 U.S. 861, 5 L. Ed. 2d 826, 81 S. Ct. 832; *People v. Prohaska* (1956), 8 Ill. 2d 579, 134 N.E.2d 799.) Such objection, to be effective, must include a request that the grounds for seeking post-trial relief be specified in writing. *People v. Houck* (1977), 50 Ill. App. 3d 274, 365 N.E.2d 576.

Here, the prosecutor objected to the oral recitation of defendant's

nonspecific post-trial motion and expressly requested that defendant specify in a written motion the grounds for post-trial relief. While the trial court allowed the oral recitation for purposes of ascertaining the merits of defendant's motion, we do not believe this excused defendant's required compliance with the State's request for specificity. (*People v. McKnight* (1979), 72 Ill. App. 3d 136, 390 N.E.2d 379.) The trial court continued the hearing on the post-trial motion to allow defense counsel ample time to prepare a motion specifying the grounds of error.

Defendant argues here, as he did in the trial court, that he could not specify all of the errors in his post-trial motion because he did not have a transcript of the proceedings. The trial court responded to this argument by reminding counsel that he had taken copious notes during trial. Further, this error was known to counsel without a transcript since at trial, he objected to the State's motion. See *People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784.

Aside from the question of waiver, we believe that defendant's contention is without merit. Defendant argues that since police officer Rochowicz erroneously testified to the substance of Oliver Holiday's conversation with him (Rochowicz), defendant also should have been allowed to testify to the substance of Holiday's conversations with him (defendant). Defendant asserts that this testimony was necessary to lessen the prejudicial impact of Rochowicz' hearsay testimony. We disagree.

Defendant's argument impliedly admits that his testimony concerning Holiday's out-of-court statements would be offered to show that what Holiday, a dead man, said to defendant was true. Such testimony is hearsay evidence and clearly inadmissible since Holiday could not be cross-examined. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.)

" 'Hearsay evidence is testimony in court * * *, of a statement made out of court, [which is] offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' (McCormick, Law of Evidence, sec. 225; see also Cleary, Handbook of Illinois Evidence, sec. 31.1 *et seq.*) * * * [T]he essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the act asserted. [Citations.]" *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.

We believe the trial court's ruling in the instant case was correct.

## VIII

Defendant next contends he was denied a fair trial when the trial court restricted defendant's cross-examination of police officer Thomas Brankin.

The State argues that the trial court's restriction was proper since the subject of his testimony had been introduced into evidence through the testimony of other witnesses. We agree with the State's position.

The State objected to the presentation of Officer Brankin's testimony. Defense counsel made an offer of proof that although Brankin investigated Holiday's death, neither he nor any other police officer requested a sample of Holiday's blood to be tested or typed. The court ordered a *voir dire* examination. During direct examination, Brankin testified that members of his unit informed him that Oliver Holiday was a witness in a double murder and, therefore, Holiday's death was not a routine narcotic overdose case. The court ruled that defendant could call Brankin as a witness. The court later ruled that the defendant could ask whether the officer personally knew if Holiday's blood had been typed or tested. Defendant objected to this restriction. The court did allow defendant to elicit from Brankin that he had been informed that Holiday was a witness to the murder of the Thomas family.

Defendant now claims that this restriction prohibited the defense from showing that Holiday was a drug addict and died from an overdose. The record discloses, however, that defendant was able to elicit this information from Dr. Tai An. Dr. An also had testified that although he had taken a blood sample from Holiday, he was not asked to do any crime laboratory blood typing while he conducted the Holiday autopsy. Dr. An also testified that Holiday had been a habitual user of narcotics. Thus, defendant was not prejudiced by the trial court's ruling which restricted the questioning of Officer Brankin.

Further, during closing argument, defense counsel emphasized the testimony of Dr. An. Defense counsel argued to the jury that Holiday was a drug addict and died of a drug overdose. He also informed the jury that Type B blood was found inside and outside the Tyrone Thomas home and that none of the victims or defendant had Type B blood. Later in the argument, defense counsel stated:

"Virginia had Type 'A' blood. The watch on her arm had Type 'B' blood. Why didn't they introduce the watch into evidence and ask Speyrene about it, like we did, because who had Type 'B' blood? We don't know, but we have a pretty good idea.

Dr. An testified that he never sent a Crime Lab specimen of Oliver Holiday for any reason whatsoever to the Chicago Crime Lab. Can you believe that?

It wasn't the doctor's fault. He told you he has to wait until there is a police request and then he sends it to the Crime Lab. They never requested it; they never requested it, even though the police department knew that Oliver Holiday was a witness, they called

him, to a triple murder. They never took a blood sample from Oliver Holiday and sent it to the Chicago Crime Lab for testing.

A police officer testified that they knew that Holiday was in the apartment with Walter, but they took the word of a dope addict, a man who died of a drug overdose and who Dr. An told you was a habitual drug addict. They had him in the police station. Oliver Holiday, and they let him go. Can you believe that?"

Considering the foregoing, we believe that defendant's contention is without merit. Since defendant was able to present evidence that Holiday was a drug addict and died from an overdose and he was permitted to make the above argument, the court's ruling did not interfere with the presentation of his defense, nor did it result in any prejudice to him.

## IX

■■ Defendant next contends that several prosecutorial comments during closing argument were prejudicial and, therefore, necessitate a new trial. We disagree.

In determining whether a closing argument is so prejudicial or inflammatory that a conviction must be reversed, the reviewing court must consider the record as a whole and the arguments in their entirety. (See *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.) Only when the remarks result in substantial prejudice to the defendant is reversal required. *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432.

### (a)

The prosecutor made the following comments during closing argument:

"I submit to you * * * that is the reason he went to the Holiday Inn for five days. It wasn't to compose himself * * * it was to dry up because Walter is a drug addict.

* * *

[Defense counsel]: Object. No evidence whatsoever."

The trial court overruled the objection.

The State argues that this comment was proper because it was based on legitimate inferences drawn from facts and circumstances proven. (*People v. Fleming* (1975), 36 Ill. App. 3d 612, 345 N.E.2d 10.) At trial, defendant admitted that he procured drugs for Holiday from one of the victims. In addition, Officer Furmanek testified that when defendant made his first statement, he said, "He wanted to get away, something about some one knowing about Walter doing drugs."

It should be noted that in determining the fairness of defendant's trial, the trial court is generally given wide latitude in controlling the comments

made during argument. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) Here, we cannot say the prosecutor's assertion represented a material factor in defendant's conviction or that the judgment would have been different had the prosecutor refrained from making this comment. See *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511; *People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800.

### (b)

■■ Defendant also contends that the following prosecutorial comments necessitate reversal:

> "Walter Boyd wanted his package tightened up and that is why he brought Oliver Holiday over there. * * *
>
> * * *
>
> The evidence, the believable evidence of Officer Frumanek, coupled with the circumstantial evidence * * * show that the defendant also used narcotic drugs, so you must then decide between a drug addict and two law enforcement officials. * * *"

Defendant failed to object to these comments at the time they were made, although he included the alleged error in his post-trial motion.

Failure to make a timely objection to improper remarks generally constitutes a waiver of that issue for purposes of appeal. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630.) In addition, where the allegedly improper comments initially are brought to the attention of the trial court in the form of a post-trial motion, that court is "in a far better position [than a court of review] to determine the prejudicial effect * * * of remarks made during argument." *People v. Brown* (1974), 20 Ill. App. 3d 1064, 1066, 313 N.E.2d 488, 490.

Notwithstanding the general rule, a reviewing court may consider the argument if the defendant would be so prejudiced as to be deprived of a fair trial. (*People v. Brown* (1974), 20 Ill. App. 3d 1064, 313 N.E.2d 488; *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) From the facts in the instant case, it appears that this issue has not been preserved properly for determination by this court since defendant failed to make a timely objection, and the trial court did not abuse its discretion in denying defendant's motion for a new trial on this issue. *People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245; *People v. Brown* (1974), 20 Ill. App. 3d 1064, 313 N.E.2d 488.

Also, we do not believe these comments deprived defendant of a fair trial so that the waiver rule should be avoided. Although the prosecutor misstated the evidence when he said defendant wanted his package tightened,[5] this comment was not prejudicial since defendant admitted he went

---

[5] The State's witness, Larry DePerry, said he went to Holiday's home to get his package tightened.

to Tyrone Thomas' home to procure drugs for Holiday. While the comment that the jury must decide between a drug addict and two law enforcement officials may have been ill-advised, it was not so prejudicial as to deny defendant a fair trial. (*People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) Mere improper statements in argument will not warrant a reversal unless it is "reasonably clear that they influenced the jury in a manner that resulted in substantial prejudice to the defendant. [Citations.]" (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 515, 366 N.E.2d 1026, 1037.) Defendant has failed to explain how the comments prejudiced him and the record fails to reveal any substantial prejudice to defendant.

(c)

■■ Defendant also argues that reversible error occurred when the prosecutor informed the jury that Oliver Holiday had not been indicted with defendant on July 29, 1976, because Holiday had died from a drug overdose on July 28, 1976. The State argues that the comment was invited by defense counsel's closing remarks. We agree.

It is well established in Illinois that when defense counsel's argument invites or provokes a response by the prosecutor, defense counsel cannot complain that the response resulted in prejudice to the defendant (*People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904), even when the prosecutor's statements are improper. (*People v. Woodley* (1965), 57 Ill. App. 2d 380, 206 N.E.2d 743; see also *People v. Evans* (1979), 78 Ill. App. 3d 996, 399 N.E.2d 1333.) If, however, the prosecutor's argument was to prejudicial that defendant was deprived of a fair trial, exception to this rule is allowed. *People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190.

In the instant case, the prosecutor's remark was provoked by defense counsel's comments in closing argument. Defense counsel stated to the jury:

"A police officer testified that they knew that Holiday was in the apartment with Walter, but they took the word of a dope addict, a man who died of a drug overdose and who Dr. An told you was a habitual drug addict. They had him in the police station, Oliver Holiday, and they let him go. Can you believe that? * * *

You know, I've been thinking. You all know and I know and they know that if this investigation had been properly conducted, Oliver Holiday would be here on trial, Walter Boyd would be the star witness for the prosecution, and they would be standing up here begging you to believe Walter.

They would have made a hero of Walter and told you what a bad man Oliver Holiday was, and they would be right."

The clear import of these remarks is that if Holiday had lived, the defendant would have been a witness against Holiday, not a co-defend-

ant, and that since Holiday had died, defendant has become a scapegoat. The evidence presented at trial amply supported the State's theory that defendant participated in the robbery. Thus, the prosecutor's reply, explaining that Holiday had died before he could be indicted, implied that Holiday and defendant would have been co-defendants and that defendant did not become a scapegoat upon Holiday's death. The prosecutor's remarks were proper as invited response to defense counsel's comments.

## X

■■ Defendant next contends he was denied a fair trial when the trial court restricted defense counsel's closing argument. During closing argument, defense counsel explored certain portions of the evidence which he believed raised a reasonable doubt as to defendant's guilt. After each example, defense counsel said, "This is reasonable doubt number one, this is reasonable doubt number two." When he argued his third example, that defendant had no intention of harming Tyrone because there was no knot in the cord tied around Tyrone's wrists, defense counsel said "And that is reasonable doubt number three."

The prosecutor objected to this comment on the grounds that defendant was defining "reasonable doubt" and the trial court sustained the objection. The trial court ruled "you cannot define; you cannot specify what amounts to reasonable doubt, * * * you can infer what the evidence is."

The judge alone may instruct the jury as to the law in a given case. Thus, where counsel instructs as to the law, he has invaded the province of the court. *People v. Campbell* (1973), 13 Ill. App. 3d 31, 299 N.E.2d 439; *People v. Wright* (1967), 80 Ill. App. 2d 300, 225 N.E.2d 460.

Further, it is within the trial court's discretion to deny counsel an opportunity to offer his own comments on the meaning of reasonable doubt. (*People v. Malone* (1970), 126 Ill. App. 2d 265, 261 N.E.2d 776.) The *Malone* court, however, did not indicate the type of comment which would constitute defining the meaning of the term "reasonable doubt." *People v. Malone* (1970), 126 Ill. App. 2d 265, 261 N.E.2d 776.

In an analogous context, Illinois courts have upheld as proper argument a prosecutor's comment which contains an example of the defendant's alleged crime. For instance, in *People v. Campbell* (1973), 13 Ill. App. 3d 31, 299 N.E.2d 439, defendant was charged with aggravated battery. In closing argument, the prosecutor stated, " 'I don't think anybody says he has got a right to struggle with a deputy. That is aggravated battery right there.' " (13 Ill. App. 3d 31, 34, 299 N.E.2d 439, 441.) The appellate court held this was proper argument since a prosecutor may draw

inferences unfavorable to the defendant if those inferences are based on the evidence.

In *People v. Pietrzyk* (1977), 54 Ill. App. 3d 738, 748, 369 N.E.2d 1299, 1305, no error was found in the prosecutor's comments to the jury:

> " 'For instance, if you were to tackle a man, * * * [and] to kick him * * *. [and] to punch him * * * [and] to stab him and cause him great bodily harm, you are guilty of aggravated battery * * *.' "

If giving examples of conduct constituting the crime with which defendant is charged is proper if based upon legitimate inferences drawn from the evidence presented (*People v. Campbell* (1973), 13 Ill. App. 3d 31, 299 N.E.2d 439; see also *People v. McKnight* (1979), 72 Ill. App. 3d 136, 390 N.E.2d 379), then giving examples of conduct which fails to constitute the crime with which defendant is charged—that is, giving examples of evidence from which a reasonable doubt of defendant's guilt can be inferred—is also proper if based on the evidence presented.

The record here discloses that defense counsel's closing argument was not restricted even though the trial court sustained the prosecutor's objection. Defense counsel continued to draw the jury's attention to evidence which counsel believed created a reasonable doubt as to defendant's guilt. Thus, any error that might have occurred as a result of the trial court's ruling is harmless especially in view of the subsequent argument which the court allowed:

> "[Defense counsel]: If you have any reasonable doubt, and I think that I have supplied many, many areas of reasonable doubt,—
>
> [Asst. state's atty.]: Objection, Judge, defining reasonable doubt.
>
> [The court]: Objection overruled. Go on."

It is evident that the trial court's ruling to which defendant objects did not hinder the defense's presentation to the jury, and therefore defendant was not prejudiced by the court's ruling.

## XI

■■ Defendant next contends that prejudicial error occurred when the State cross-examined him as follows:

> "[Asst. state's atty.]: Of course if you had actually cut Michelle Thomas' throat or cut Tyrone Thomas' throat or shot Virginia Thomas between the eyes or shot her in the back of the head, you would come in here and you would tell the ladies and gentlemen of the jury that, wouldn't you.
>
> [Defense counsel]: Objection.
>
> The court: Objection overruled.
> * * *

[Defendant]: I wouldn't be able to tell you what I would do because I didn't do that. * * * Probably would have plea-bargained.

* * *

[Asst. state's atty.]: You say that you would have taken a plea bargain?

[Defense counsel]: Objection.

The court: Objection sustained.

[Asst. state's atty .]: Well, you didn't get the offer you wanted.

[Defense counsel]: Objection.

The court: Objection sustained, and the jury is instructed to disregard the statement of the State's Attorney.

* * *

[Asst. state's atty.]: By the way, Mr. Defendant, you are pretty slick aren't you?

[Defense counsel]: Objection.

The court: Objection sustained.

[Asst. state's atty.]: You have an answer for everything, don't you?

[Defense counsel]: Objection.

The court: Objection sustained.

* * *

Mr. McGann, I don't think that that deportment is accurate or correct or right conduct in any way whatsoever.

Just try the lawsuit.

[Asst. state's atty.]: Well, Sir, the reason that you didn't accept the plea bargaining, you thought the State thought these lives were worth more than you did?

[Defense counsel]: Objection. * * *

The court: Objection sustained.

Proceed.

[Asst. state's atty.]: You placed the same value on your life today that you placed on them June 29, 1976, isn't that true.

[Defense counsel]: Objection.

The court: Objection sustained."

After a side bar, the assistant state's attorney apologized to the court and the jury.

The State argues that defendant has waived consideration of this error for purposes of appeal, since he failed to include the error in his post-trial motion. For the reasons stated in prior sections of this opinion, we agree. Aside from the issue of waiver, the error which occurred here was harmless in view of the court's rulings and remarks to the jury.

While it was improper for the prosecutor to persist in the same line of

questioning after receiving an adverse ruling on the propriety of the questions by the court (*People v. McKnight* (1979), 72 Ill. App. 3d 136, 390 N.E.2d 379) and we strongly disapprove of this conduct, we cannot say that the result might have been otherwise, had the questions not been asked (see, *e.g., People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454). The prejudicial impact of these improper questions was lessened when alert defense counsel properly objected and the trial court correctly sustained the objection with the admonition that the offensive question be stricken. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634; see also *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.) In our opinion, the improper questioning was not a material factor in defendant's conviction, and, therefore, does not require reversal. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

## XII

■■ Defendant next contends the trial court abused its discretion when, after jury deliberation began, it refused the jury's first and second request for the transcript of defendant's testimony and a third request for a transcript of all the testimony. The State contends that defendant acquiesced in the trial court's exercise of discretion and therefore waived the error. The State also argues that defendant waived the issue when he failed to object to the error at trial, failed to include the error in his oral post-trial motion, and failed to include the error in his written post-trial motion, after the State objected to the oral presentation of defendant's post-trial motion.

The waiver doctrine properly is invoked in instances where a defendant fails to object to the trial court's decision to deny a jury's request to review trial testimony and also fails to include the error in his written post-trial motion. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.) Defendant cannot acquiesce to a response which his timely objection might well have altered, fail to allege this as error in his post-trial motion for a new trial, and then claim error for the first time before this court. *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.

The record before us clearly demonstrates that defendant acquiesced in the trial court's decision to deny the jury's requests for transcripts of testimony. After the court received the jury's requests, the assistant state's attorney and defense counsel met in chambers to discuss the requests and the following colloquy occurred:

"The court: Have we agreed that no further testimony or copies of transcripts of testimony be given to the jury?

       ✸  ✸  ✸

If you don't want to agree to it, I will rule.

       ✸  ✸  ✸

[Defense counsel]: So, you know, the Supreme Court, I guess,

puts the onus on you and I understand you are asking us if we agree to it.

The Court: That's right.

\* \* \*

I don't think [the testimony] can help them at all. I think they have heard the evidence and in my opinion they must be bound by what they heard without emphasis on one particular testimony over that of other testimony [sic].

[Defense counsel]: I think that ends the matter. So, the Judge exercised his discretion.

The court: I am just telling you my opinion, but I want to know whether or not you agree.

[Defense counsel]: This hits so suddenly I don't know what to say. I haven't given it a great deal of thought. Judge, off the record a minute?

[An off-the-record was had among court and counsel, whereupon the following proceedings were had]:

The court: Memo from the desk of Judge Francis J. Mahon.

Jury, you have heard the testimony and your verdict must be based on that testimony, the stipulations, and the exhibits received into evidence.

[Defense counsel]: That is right from an instruction anyway. That is fine."

This discussion amply illustrates that defendant did not object to the court's decision and, in fact, agreed to the court's denial of the jury's requests.

Further, this colloquy between counsel and the court also demonstrates that the trial court properly exercised discretion in reaching its decision. A trial court must exercise discretion in considering a jury's request to review testimony after the jury has commenced deliberation. *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166.

In the exercise of this discretion, the trial court may refuse or allow a jury's request for the review of testimony. On appeal, "[a] decision within the trial court's discretion will not be disturbed \* \* \* unless there has been an abuse of discretion." *People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577, 578.

In the instant case, the testimony was voluminous and the trial court was concerned that there be no special emphasis on the testimony of one witness as compared to another witness. We do not believe that the trial court's decision to deny the request was an abuse of discretion. See *People v. Farley* (1976), 37 Ill. App. 3d 178, 345 N.E.2d 724.

## XIII

■■ Defendant finally contends that the trial court committed error when

it imposed three concurrent prison terms of 100 to 300 years upon him. Defendant asserts the trial court (1) failed to consider the constitutionally required objective of restoring the offender to useful citizenship, and (2) penalized him for proceeding to trial. We disagree.

The imposition of a sentence is within the sound discretion of the trial court and, absent an abuse of that discretion, a court of review has no authority to modify the sentence. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The record here does not support defendant's contention that the trial court failed to consider the objective of rehabilitation when it sentenced defendant.

We also find that the trial court did not penalize defendant for proceeding to trial. Defendant argues that the sentence was imposed to penalize him for proceeding to trial. In support of this contention, defendant points to the fact that prior to trial the prosecutor offered defendant a sentence of 15 to 30 years in exchange for a guilty plea.

That the trial court, after a jury trial and a verdict of guilty, exercised its discretion and imposed a more severe sentence than suggested by the State prior to trial does not mean that defendant was penalized for proceeding to trial. Defendant does not suggest, nor does the record reflect, that when the trial court sentenced defendant, it failed to consider the mitigating factors argued by counsel.

After the hearing in aggravation and mitigation, the trial court indicated to defendant that he had heard defense counsel's arguments in favor of a low sentence. When asked if defendant wanted to address the court, defendant declined. The trial court then noted the especially brutal method employed to kill the victims and the betrayal of the friendship between the victims and defendant which led to the savage murders:

> "You said that Tyrone Thomas and his family were your friends. Because of this friendship and trust you were admitted into their home which was otherwise protected from strangers and intruders by bars and bolts and locks and by a police dog who also must have thought you were his friend. * * * The jury found that you were the Brutus in this case, you were the Brutus to Tyrone, for the evidence shows that he, too, was stabbed in the back, as well as having his throat and that of his daughter's slashed."

Based on the evidence presented, we find that the trial court did not abuse its discretion when it imposed these sentences.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI and ROMITI, JJ., concur.